## SUPREME COURT—IN PROBATE.

In the Matter of the Proof of the Will of Jose Nadal.

Where the legal meaning and effect of the language used by the party, who prepared the instrument offered for Probate, differed materially from that of the language used by the testator in delivering his instructions : Probate of the instrument refused,

Besides mere formal proof of execution, the conscience of the Court must be satisfied that the instrument propounded is the last will of a free and capable testator.

Justice Robertson delivered the decision of the majority of the Court as follows :

On the 9th of August last, the Right Rev. Louis Maigret, Roman Catholic Bishop at Honolulu, filed a petition, as sole legatee, for probate of the last will of Jose Nadal, late of Honolulu, deceased, before the Chief Justice at Chambers. The hearing was set for the 18th of August, and upon that day counsel appeared to contest the will offered for proof, on behalf of Prince L. Kamehameha. On the 6th of September, the Chief Justice gave judgment in favor of the validity of

the will, and thereupon an appeal to the full Court was noted on behalf of the contestant.

When the matter came up for hearing on appeal, counsel for the contestant moved the Court to impannel a jury, to try the issues of fact involved in the cause, in virtue of Section 854 of the Civil Code, which provides that in all matters to be tried before a single Justice, a special jury may be impanneled, at the discretion of the Court, to try issues of fact. The Court overruled the motion on the ground that, by Section 1,241 of the Civil Code, it is expressly provided that all probate causes shall be heard and determined by the Court or Justice, without the intervention of a jury, making that class of cases, as it always was, before the enactment of the Code, an express exception to the general rule, as laid down in Section 854.

It appears, by the testimony, that Jose Nadal died in the Queen's Hospital, on the 3d of August, whither he had removed from Makiki about a fortnight before. On the 21st of July he executed a document, in the Hawaiian language, purporting to be a will, by which he bequeathed all his property to Prince L. Kamehamha, with a proviso that he should give a part of the property to the decedent's daughter, Catalina Nadal, who resides at Santa Barbara, in California ; and on the 30th of July he executed the document now presented for probate, which is in the English language, and dated the 31st of July, bequeathing all his property to " the Rev. Dr. Maigret, Roman Catholic Bishop of the Sandwich Islands, his heirs and assigns," and appointing William Bromley Barnes his executor.

Nadal was afflicted for a number of years previous to his death with chronic rheumatism and asthma, and latterly with dropsy produced by disease of the heart. He was always a superstitious man—a believer in spectres and native charms. After entering the Hospital, his weakness in this respect became excited by disease, and by the fear of approaching dissolution. He was afraid, even in the day-time, to be left alone in his chamber for a week before he died, shedding tears if left alone, and saying that he saw supernatural sights and evil spirits. A woman died in the Hospital about the 26th of July, and he expressed his fear that her ghost would come for him. Sometimes

he was observed to stretch out his hand, saying, " Go away, go away ! I don't want you," as if speaking to some spectre which he fancied he saw.   At times he conversed with another patient who slept in the same room about religion, saying he had been a great sinner, and asking to have portions of the New Testament read to him.   He was visited by some of the priests and members of the Roman Catholic Church, to which he belonged. Bishop Maigret visited him a few days before his death.   He was also visited by Mr. John Ii about the 1st of August, to whom he stated in conversation that he saw spectres, and was much troubled by some natives at Makiki, who were working incantations against him ; and that he had made a will bequeathing his property to Prince L. Kamehameha, to whom, and to whose family, he expressed his gratitude for long continued favors.   Some conversations between Nadal and other parties, in relation to his intended disposition of his property, were given in evidence.   About four years ago he stated to Robert E. Wakeman that he should leave his property to the Bishop, as " that was his religion."   Subsequently, he stated to Mr. Haalelea, and to Mr. R. G. Davis, at different times, that he intended to leave his property to Prince Kamehameha.   For the last twenty-six hours previous to his dissolution he was in a comatose state.   He is believed to have been a native of Spain, but had resided in this country for many years.

The validity of the instrument now presented as a will is contested on several grounds : First, that it is evidently the off-spring of an insane state of mind—the result of mental terror, and not of natural desire or intention ; secondly, that the will presented would carry the property to Bishop Maigret and his personal representatives, not to the Church, as Nadal intended; thirdly, that if it was made by the decedent for " the benefit and rest of his soul," it is a will to superstitious uses, and ought, therefore, to be held void.

Upon examining the evidence, we find one deficiency in the proof of the execution of the document.   By Section 1465 of the Civil Code, it is required that every will shall be " attested' by two or more competent witnesses subscribing their names to the will, *in the presence of the testator*."   There are two subscribing witnesses to this instrument, but it is not expressly proven

that one of them, Alfred Doiron, subscribed his name in Nadal's presence.  If the Court should refuse probate on that ground, the proponent might, probably, under our practice, renew his application, upon affidavit ; and as the contestant has not raised the objection, we presume he is satisfied from all the evidence that the document was in fact executed with the formality which the statute prescribes.

There is another and a much more important point in the cause, which constitutes the second ground of objection raised by counsel, and which should naturally be considered and disposed of before adverting to the other two.   The point arises from the apparent variance between the form and legal effect of the instrument now propounded, and the verbal instructions which the decedent gave for the preparation of a will.  Admitting that the document now presented was duly executed by the decedent while he was possessed of full capacity to make a disposition of his property, there is still a most important question to be determined by the Court, as to whether or not this instrument does in fact express *the will* of Jose Nadal ; for it is the mental volition, the intention and consent, of the party, that give life to the instrument.  "A will," says Sir John Nicholl, "means not barely the signing of it, and the formal publication or delivery, but proof in the language of the *condidit*, that he well knew and understood the contents thereof, and did give, will, dispose and do, in all things as in the said will contained." (Zacharias *vs.* Collis, 3 Phillimore, 179.)   Swinburne, in his excellent Treatise, says, "This word *Testamentum* is as much as *testatio mentis*, that is to say, a testifying or witnessing of the mind."  And in giving the definition of a testament, he says, "A testament is a just sentence of our will, touching that we would have done after our death."  And, again, "For without meaning or consent of mind, the testament is altogether without life ; and is no more a testament than a painted lion is a lion." (Swinburne on Wills, Part First, Secs. 1, 2, 3.)

Let us now refer to a portion of the testimony in the present cause.  It appears that Nadal was visited at the Hospital by Mr. Jason Perry, a Portuguese by birth, and a friend of the decedent.  Mr. Perry, who is the chief witness introduced to establish the will now propounded, is an intelligent and highly

respectable member of the Roman Catholic Church. He stated that Nadal requested him to have a will drawn up disposing of his property, and told him how he wished it made ; and that he communicated Nadal's instructions to Mr. Walter Lee, a solicitor, who drew the will now presented. Upon the question being asked by counsel, "Did Nadal direct his property to be left to the Bishop personally ? " the witness replied "Yes," and then repeated the decedent's *own expression,* "To the Roman Catholic Bishop, he said, for the benefit and rest of his (Nadal's) soul. I told Mr. Lee that the will was to be made for *the benefit and rest of his soul.* I cannot say how it was that it was drawn to Bishop Maigret, his heirs and assigns." And on being asked, as a Roman Catholic, what he understood by the decedent's words, he replied, "I should say that the words, 'to be for the benefit and rest of his soul,' mean, for prayers for the rest of his soul." In the incidental conversation with the witness Wakeman, too, it may be observed that Nadal said, "he should leave all his property to the *Catholic Bishop, because that was his religion ;* " the fair import of which expression we understand to correspond with the witness Perry's explanation of the decedent's language to him, viz : an intention to bequeath his property to the person holding the office of Bishop at the time of his death, for the purpose of having masses or prayers said for the rest of his soul ; for his *religion* did not require him to bequeath his property to Bishop Maigret personally.

The variance, as to legal effect, between the instrument drawn by Mr. Lee, and an instrument drawn in accordance with Nadal's instructions to Mr. Perry, is quite clear. The first is a will in favor of Bishop Maigret, as a private individual, to the sole use and benefit of himself and his personal representatives, while the other would have been a will in favor of the Roman Catholic Bishop, in his official capacity, as trustee for the Church, to secure the celebration of masses or prayers for the rest of the testator's soul ; that is to say, a will in favor of the Church. This distinction was not overlooked by the proctor for the proponent, who, in the course of his argument, admitted that if the Court could find this document to be a will in favor of the Church, his client could not take under it. He argued correctly that this is a will in favor of Dr. Maigret and his heirs ;

and in order to remove any doubt as to his client's capacity to acquire property to his private use, he introduced as à witness Mr. Modeste, a Roman Catholic priest, who testified that the clergymen of that Church here are of the order of the Sacred Heart, and are not precluded by the rules of their order from acquiring property to themselves, by inheritance, gift, or any other legal way.

The very fact that this is not a will in favor of the Church, but a will in favor of an individual, forms the first point at issue, and first strikes at the validity of the instrument; for, while the law has not made it requisite that a will should assume any particular form, or be couched in language technically appropriate, it should disclose the real intention of the maker respecting the posthumous destination of his property. (Jarman on Wills, Vol, I., page 13.)    But it is argued that the document now presented was duly executed by Nadal, after it had been read over to him, and had received his approval, and therefore with a proper knowledge of its contents and import. Under the circumstances of the case, the onus clearly rests upon the proponent to establish that position.    Speaking of the rules governing cases where wills are prepared by parties who take an interest under them, and thereby suspicion is raised as to the validity of the wills, which rules would seem to be equally applicable in cases like the present, the learned Mr. Baron Parke, in Barry vs. Butlin, said, on behalf of the Judicial Committee of the Privy Council, "The rules of law according to which cases of this nature are to be decided do not admit of any dispute, so far as they are necessary to the determination of the present appeal, and they have been acquiesced in on both sides.    These rules are two, the first that the onus probandi lies in every case upon the party propounding a will, and he must satisfy the conscience of the Court that the instrument so propounded is the last will of a free and capable testator. The second is, that if a party writes or prepares a will, under which he takes a benefit, that is a circumstance which ought generally to excite the suspicion of the Court, and calls upon it to be vigilant and jealous in examining the evidence in support of the instrument, in favor of which it ought not to pronounce unless the suspicion is removed, and it is judicially

satisfied that the paper propounded does express the true will of the deceased. These principles, to the extent that I have stated, are well established." (Jarman on Wills, page 44, note 4.) The same principles, we apprehend, are applicable in any case, where from the circumstances there are well founded doubts as to whether or not the testator had full knowledge of the contents, and legal import, of the instrument propounded. Mr. Surrogate Bradford, of New York, in the case of Burger vs. Hill, which is a case much in point, held that, besides being satisfied as to the capacity of the decedent, it is for the Probate Court to determine, whether in performing the particular act in question he had an intelligent understanding of the contents and effect of the instrument executed as a will ; and that, generally, the *animus testandi* is to be inferred from the act of signing and formal publication ; but where the capacity is weakened and impaired, though not destroyed, and there is evidence of undue influence, fraud, imposition, or mistake, the presumption derived from formal execution, may be diminished or entirely overcome. (Bradford's Rep., Vol. 1, page 360.) The same learned Judge held, in the case of Weir vs. Fitzgerald, that, " Besides mere formal proof of execution, something more is necessary to establish the validity of a will when, from the infirmities of the testator, his impaired capacity, or the circumstances attending the transaction, the usual inference cannot be drawn from the formal execution. Additional evidence is required that his mind accompanied the will, and that he was cognizant of its provisions." (Bradford's Rep., Vol. 2, page 42.) The language of Bradford, in the case of Burger vs. Hill, is applicable in the present case. Speaking of the testator, he said : " He obviously meant to make a will, but whether he intended to make this particular will, whether his instructions were comprehended, whether they were correctly put in writing, whether when the will was read he understood its contents, whether they conformed to his real wish, whether in fact this is his will, is to be determined only by a considerate examination of all the circumstances attending the transaction."

In addition to the fact that the instrument propounded in this case was duly executed, there is proof that it was read over to the decedent in the English language by Mr. Perry,

who, on his examination, said, " I took the will to be signed on
the afternoon of the same day that it was made. I read it
over to him slowly. I asked him in English if he understood
what I was reading, and he said he did ; and after he had
signed he began to speak Spanish. I don't know whether he
understood what ostentation meant or not. I think he under-
stood enough to know the meaning of the will." Mr. Doiron
testified : " I heard the will read over by Mr. Perry. The
deceased seemed to understand it. Perry asked him twice if
he understood it, and he said yes."

On the other hand, it is clear, as already observed, that the
instrument varies materially from the instructions given by
Nadal to Mr. Perry only a few hours before it was signed. It
is apparent, from the testimony of Langherne Desha, the as-
sistant of the Hospital Physician, George Champlin, who slept
in the same room, and of others, that Nadal was much troubled
at the approach of death, and about his soul's welfare. Desha
testified that during twelve years service as an assistant prac-
titioner, he had seen many persons die, of various races and
creeds, but he never saw any one so much frightened at death
as Nadal was. It seems to us evident, then that, as death drew
near, Nadal, either by the advice of friends, or promptings of
his own heart, formed the purpose, natural to a superstitious
mind, of providing for his future peace by disposing of his
goods, so far as he was then capable of making a disposition,
for the procurement of prayers " for the benefit and rest of
his soul." There is no evidence that he subsequently changed
his mind in regard to the destination of his property, or that
he was aware that the will prepared for him did not conform
to his desire. The English language, in which the document is
written, was to him a foreign language, with which he was but
imperfectly acquainted. His execution of a will in that lan-
guage is like the execution of a will by a person who is unable
to read ; for it is not shown that he could either read or write
it. On the contrary, Mr. Perry, who was for eight years his
next door neighbor, and his intimate acquaintance, said he had
never seen him write anything but his own name, Jose, nor
read any language other than the Spanish. We think it would
be a violent presumption, indeed, to suppose that Nadal was

aware of the variance between the paper drawn up for him and his instructions; for Mr. Perry, who is a much more intelligent man, did not understand the difference till it was pointed out by counsel, and of course he did not direct the decedent's attention to it.

Can the conscience of the Court, then, be satisfied, upon the evidence adduced, that this instrument does truly express the *last will* of Jose Nadal as to the disposition of his property? Does it disclose his *real intention* respecting its destination? We think not. There is not a particle of proof that Nadal was upon intimate terms of friendship with Bishop Maigret, or that he ever intended to bestow his property upon him, as an individual, because of any obligations which he felt himself under to the Bishop personally; but, on the contrary, it seems to us clear as evidence can make it, that, while seeking to quiet his fears by making a will in favor of the Church, and so providing a fund of prayers for his soul's peace, he has, through mistake, or the misapprehension of other parties, been made to execute such an instrument as he never intended.

The question here involved is not of a nature to be decided by rules of legal construction. There is no controversy as to the meaning and effect of the language actually used in the document; and there can be no doubt that the meaning and effect of the language which Nadal used, in delivering his instructions to Mr. Perry, are entirely different from that of the language which has been used by those who prepared the instrument. The rules of construction, therefore, are not applicable here— there is no room for their operation. The question raised is one which must be decided before construction becomes necessary. It is a question of fact, as to whether or not the language used in the paper accords with the language used by the decedent in giving his directions. In our view, the evidence shows, conclusively, that it does not. The objection now discussed may be illustrated by supposing that Nadal had intended to bequeath his property to some charitable institution, such as the " Queen's Hospital," for instance; but that he had, through mistake, or the misapprehension or disregard of his instructions by others, been made to execute a personal bequest to "*A. B.*, President of the Queen's Hospital Association, *his heirs and assigns*,"

thereby diverting the property to private use. Upon the mistake being clearly proven, could· A. B., or his heirs, take the property, directly in the face of the decedent's intention, and to the exclusion of his daughter, ·Catalina Nadal ? Certainly not.

This objection is, in our opinion, fatal; for, if the Court should allow this instrument to stand, it would, it seems to us, fail in maintaining those principles of law .which operate as necessary safeguards for protecting the rights of all parties interested in the posthumous disposition of property.

We deem it unnecessary to examine or to express any opinion upon the questions raised as to the decedent's sanity, or the extent of his testamentary capacity, at the time this paper was signed ; and as to whether or not a will made according to Nadal's instructions, would have been a will to " superstitious uses."

Probate of the instrument propounded is refused.

February 20, 1861.

———

### DISSENTING OPINION OF ALLEN, C. J.

The majority of the .Court are of opinion that the variance between the form and legal effect of the instrument propounded, and the verbal instructions which the decedent gave for the preparation of a will, is fatal, and, therefore, it becomes unnecessary to examine any other points which have been made in the case.

In considering this position, it· is necessary to examine carefully the testimony applicable to this part of the case.

The decedent had been afflicted with asthma and cough for a long time, and had been removed to the Hospital about a fortnight before his death. The witness, Mr. Perry, a very reliable and intelligent man, testifies that he had. known him since 1851, and had lived next door to him for eight years, and was intimately acquainted ·with him ; that he called upon him at the Hospital on the day before the will was made ; that he, Nadal, directed him to have a will made, and he testifies that he did so according to his instructions ; he further affirms that when

he took the will to him, he read it over to him carefully, and he says, "I asked him if he understood what I read, and he said he did." There was another person present when the will was executed, who heard Mr. Perry read it to the decedent, and ask him twice if he understood it, to which he replied that he did. "He directed me to leave all his property to the Bishop personally, and he then added, 'To the Roman Catholic Bishop, for the benefit and rest of my soul.'"

It appears that the will was drawn in favor of the Bishop personally—and this is in conformity to his directions—unless this was modified by his subsequent declaration that the will was to be made to the Roman Catholic Bishop for the benefit and rest of his soul. The will was written without regard to the qualifying words, and on being read carefully over to him, was approved by him. If this was done understandingly, as the testimony is, it was an approval of the will as written, and in conformity to his first directions. It was clearly read, and he was carefully interrogated, and he appeared to understand the nature of the will. If he did so, it was clearly an approval of the will as written. It is the opinion of the witnesses that he did, although the will was drawn in the English language, yet the language was familiar to him, and to the witness, as well as his native language, so that there was no danger of misapprehension. That he had entertained at different periods different views of disposing of his property is undoubtedly true ; at the same time the present disposition is in accordance with his expressed opinion. It is very clear that this disposition of his property was probable. He had been separated from his family for nearly thirty years, and as it appears, from his declaration, he had thought that his daughter was well provided for. He was not a devotee to the Church, or constant attendant, yet he was undoubtedly on pleasant terms with the Bishop, and from early associations allied to that Church. It does not appear to me that although he said, in giving directions about his will, that he wished a disposition which should be for the benefit and rest of his soul, that it carried an intent that this property was to be set apart, and the interest of which was to be devoted to the perpetuation of prayers, during all ages, for the peace and rest of his soul. He had a religious

sentiment which influenced his mind, as well as a regard for the Bishop, in whom he had confidence that the property would be disposed of for the best and most useful purposes. His instructions were in favor of the Bishop, and expressing the opinion, which was natural to one in his frame of mind, that it would be for the peace and rest of his soul. I do not regard it as having a controlling influence over the terms of the devise, but the language which he used, that the devise should be made to the Bishop personally should control. So that in either event, whether regard is had to the words originally used in giving the direction, or whether the knowledge of the will as drawn, which was so carefully communicated to him by the witnesses, Perry and Doiron, it does not appear to me that there has been any mistake, misapprehension or error. He was a weak minded man, with strange fancies and superstitious notions, but he had, as I think from the evidence, sufficient testamentary capacity, and a clear intention of his own purposes and designs at the time of the execution of the will.

Let us consider the intent he had in the use of the language: That he had a religious sentiment in its use, is very clear, and that this influenced him in making a devise to the Bishop, still it will not be considered as a reason for defeating a will, because, without influence, with a free and independent mind, a person makes a will to a religious teacher, if he does entertain the belief and hope that the property may be used for the promotion of religious objects. It is placed at the disposition of one in whom he has confidence, to be used as he may deem best for the interests of himself and heirs, and the promotion of such objects as he may regard useful. It is not the province of the law to analyze the sentiments and feelings which dictated a devise. Every man is entrusted with an enlarged discretion in relation to the disposition of his property, and this disposition should not be intefered with if the devisor has a sound and disposing mind and memory. Dr. Hillebrand, who was the medical adviser of Nadal, testifies that he had been acquainted with him many years; he was called to minister to him the day before he entered the Hospital; he says his mental condition was the same as it had been for the previous four months, but his bodily symptoms were not so good—he

had dropsy ; he saw him every day while he was in the Hospital, and conversed with him ; for some twenty-five or twenty-six hours before his death he was in a comatose state ; but, up to that time, his mental condition was the same as usual ; he was in his usual state on the 1st of August, and all the time previous to it ; he did not observe any falling off of his mental capacity from the day he saw him at Makiki until the 1st of August ; he should judge that he was capable of managing his own affairs up to that time. He says, on one occasion Nadal said to me, pointing to Bishop Maigret, "The Bishop will look out for you"—I suppose he meant in regard to my bill. He referred to the Bishop in respect to the settlement of some other items of business, fully showing that his mind was fixed and clear in this purpose. He says that Nadal was a weak minded man ; that he was cautious and looked after his own interests ; he was very fond of money ; he was a superstitious man, and was alarmed at the prospect of death, and disturbed at the apprehension of spirits. But the opinion of his medical adviser, who had known him so long and so well, upon his mental capacity, is worthy of great consideration. It is a safer opinion to rest upon than to embark in speculations and conjectures. There is other evidence which sustains this view of the doctor, that his mental capacity was sufficient to give direction to his own business. In the case of Berger *vs.* Hill, 1 Bradford's Rep. p. 362, the Court says :

"The standard of capacity necessary to the performance of a valid testamentary act, is fixed by the law, in as precise terms as possible. Abstractedly speaking, capacity or incapacity can of necessity, be defined only by a general positive or negative expression ; soundness or unsoundness of mind and memory. The judicial interpretation given to these terms leads to the established proposition, that mere imbecility or weakness of understanding or memory, is not sufficient of itself, and apart from the particular act, to disable a person from disposing of his property by will. (Stewart's Ex. *vs.* Lispinard, 26 Wend, 255 ; Blanchard *vs.* Nestle, 3 Denio, 37 ; Clark *vs.* Sawyer, 2 Comstock, 498.)

"Mere weakness of understanding is no objection to a man's disposing of his property by will, for Courts cannot measure the

Will of Jose Nadal.

size of people's understanding and capacities, nor examine into the wisdom or prudence of men in disposing of their estates." (1 Jarman on Wills and authorities there cited.)

From this evidence, I am of opinion that he had sufficient capacity to sustain a testamentary act. In this case the Court is free from a very embarrassing difficulty, which frequently occurs, and that is, to determine whether the deceased was the subject of undue influence and imposition at the time of the execution of the will. There is no evidence of an effort on the part of any one to influence him in the terms and conditions of the will. He gives directions for the will, and it is made in conformity with his wishes, as I think. It is in evidence that he had entertained different views in relation to the disposition of his property. This is not unfrequent. But the question, as the case now stands, is whether the will is made in conformity to instructions. I regard the evidence as conclusive that he had sufficient mental capacity to make a will ; that his instructions were clear to make the will to the Bishop *personally;* and that it was made in pursuance of said instructions. This is wholly incompatible with a devise to the Roman Catholic Church. I see no possibility of mistake to one who had a disposing mind and memory, whether a devise to Mr. A. *personally* would convey the property to Mr. A., president of a charitable association. This very language indicates clearly that the intent was to devise the property to the Bishop, and not to the Church. Evidence has been fully given in relation to the intention of the decedent of the disposition of his property at different times, and the will is in accordance with his intention as previously expressed, although he had not been uniform in this expression. There is no question of fraud, imposition, or undue influence, relating to the making of the will—no ambiguity exists on its face, and no uncertainty as to person or the property—and in view of all the circumstances, and especially of what transpired at the time of making the will, I am satisfied that he was clear in his testamentary intentions, and that the will contains them.

In the construction of the will there is no doubt. It is clear and explicit in its terms—and the intention of the testator is manifest, and no surmise or conjecture of any object of what the testator may be supposed to have had in view, should be

allowed to have weight either in giving construction to a will, or in defeating it. It must be proved, and to set aside the clear and explicit terms of a will by declarations of an uncertain intent and meaning is against the principles of construction recognized by all legal writers. In the case of Doe dem Givillium (5 B. & A., 129), Baron Park said, "It is often extremely difficult to say what the actual intent of a testator was ; the Court is to ascertain not what the testator actually intended, but what is the meaning of the words he has used. It must be often matter of mere conjecture what he actually meant to be done, but there can be no doubt whatever what is the meaning of the words he has used." Here, in this case, if we abandon the force of the declaration that the will was to be made to Bishop Maigret personally, and that it was in fact so made, and signed after the same was carefully read over, and give way to conjectures of what his intent may have been, in the use of the language that the disposition of his property should be for the benefit and rest of his soul, the result of an adjudication must be singularly uncertain. It would be dangerous, it seems to me, to leave the strong holds of a case, and embark on the uncertainties of qualifying declarations, although made at the time directions were given to have the will made, when it appears that the will was made without reference to such qualifications, carefully read over to the testator, and by him approved.

While I have great respect for the opinion of my brethren, I feel constrained to say that, in my judgment, the will of Jose Nadal should be admitted to probate.

Mr. John Montgomery, for petitioner.

Mr. C. C. Harris, contra.